UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

RUBY J. BERRY,
    PLAINTIFF

VS.

MICHAEL ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY,
    DEFENDANT

CASE NO. 1:09CV000411
(DLOTT, J.)
(HOGAN, M.J.)

## REPORT AND RECOMMENDATION

Plaintiff filed her applications for Disability Insurance Benefits and Supplemental Security Income in June, 2005. Her applications were denied, both initially and upon reconsideration. She requested and received a hearing before an Administrative Law Judge (ALJ) in November, 2008 at Cincinnati, Ohio. Plaintiff, who was represented by counsel, testified as did Micha Daoud, a Vocational Expert (VE). In January, 2009, the ALJ reached an unfavorable decision. The Appeals Council refused review in April, 2009 and in June, 2009, Plaintiff timely filed her Complaint seeking judicial review.

### PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that she was born in 1962, was 5'7" tall, weighed 210 lbs., is right handed, lives with her employed "boyfriend" of 14 years, and smokes 1/2 pack of cigarettes per day. Her drivers license was suspended for lack of insurance. Plaintiff completed the ninth grade, but never obtained a GED. Prior employment was as a housekeeper at Courtyard Management and at B.F. Saul, from which she was fired for being late and missing work.

When asked why she claimed to be disabled, Plaintiff mentioned COPD, rheumatoid

arthritis and "mental issues." She sees two rheumatologists, Drs. Badreddine and Greenblatt and Shawn Masters, a mental health therapist employed by Central Clinic, for depression. She admitted to being a prior user of marijuana and crack and further admitted to having a criminal conviction for smuggling drugs into prison, an offense for which she was sentenced to prison. Her last use of both previously mentioned illegal substances was "a few months ago." She further admitted to having a pending charge of crack cocaine possession.

Plaintiff testified that she could sit for approximately one half to one hour, stand for 20-30 minutes and walk for "a couple of blocks." She is able to do dishes and talk on the phone, but described her most limiting problem as fatigue and "staying awake," and lack of energy, a situation Plaintiff attributes to the medicines she is taking. Plaintiff testifies she sleeps approximately 4 hours per night, doesn't take naps and spends her time "just sitting around." She is able to cook occasionally, grocery shop with her niece and visit with her son and grandchildren.

Plaintiff spends most of her day lying down. She suffers from chest pains and shortness of breath, for which she takes Advair. She also suffers from flights of ideas and has difficulty concentrating. (Tr. 321-337).

## STATEMENTS OF ERROR

Plaintiff asserts five Statements of Error: "(1) The failure to explain how the ALJ arrive at her residual functional capacity, (2) The failure to give good reasons with regard to Dr. Greenblatt and Shawn Masters, (3) The weight to the treating sources. (4) The credibility, subjective complaints and pain, and (5) the vocational errors." Each is a phrase, not a statement, but the briefs do explain about what Plaintiff is complaining.

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The VE was asked to first assume that Plaintiff was capable of performing a routine one and two step job, as stated in Exhibit 5F, the report of Dr. Eggerman, without strict time or production pressures and only occasional manipulation of the hands. The VE located a

representative number of light and unskilled jobs as an information clerk and a representative number of sedentary unskilled jobs as a surveilance system monitor and as a callout monitor.

The second hypothetical, containing the residual functional capacity assessment ultimately accepted by the ALJ, asked the VE to assume all the limitations suggested by Dr. Eggerman and that Plaintiff cannot use her hands on a repetitive, but can use them on an occasional, basis. The VE's response was that the same number of jobs would be available.

The third hypothetical, based on Exhibit 14F, the report of counselor Shawn Masters, would preclude all forms of competitive work, according to the VE.

The fourth hypothetical assumed all the limitations described in the first and added that Plaintiff have no excessive exposure to dust, gas, fumes and chemicals. The VE responded that there would be no diminution in the number of jobs available.

The fifth and, thankfully, the last hypothetical asked the VE to assume the accuracy of Plaintiff's testimony. The VE responded that Plaintiff would be unemployable.

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff has a number of impairments; rheumatoid arthritis, depression, posttraumatic stress disorder, a personality disorder and a history of polysubstance abuse. The ALJ found all of Plaintiff's impairments to be severe, but none, either alone or in combination, met any Listing. The ALJ found that Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels, subject to three nonexertional limitations: (1) only occasional manipulation with the hands, (2) only one or two-step routine job duties and (3) no strict time or production pressures.

## THE MEDICAL RECORD

Plaintiff was evaluated by Carla Dreyer, Psy.D., in July, 2005. The history disclosed that in addition to the conviction discussed in her testimony before the ALJ, Plaintiff has been convicted of felonious assault, aggravated assault, theft and domestic violance. Dr. Dreyer's conclusions were that Plaintiff was mildly to moderately impaired in each of the four work-

related mental abilities: the ability to relate to coworkers, supervisors and the public; the ability to understand, remember and follow simple instructions; the ability to maintain attention, concentration, persistence and pace; and the ability to withstand the stress and pressure associated with work activities. Dr. Dreyer's diagnosis was Depressive Disorder and a Personality Disorder. (Tr. 124-129).

She was also examined by Loraine Glaser, M.D., in October. 2005. Plaintiff told Dr. Glaser that she was unable to work because of multiple joint pain and severe fatigue. Dr. Greenblatt, a rheumatologist, prescribed Methotrexate and Prednisone. Dr. Glaser diagnosed Plaintiff with rheumatoid arthritis, hypertension, asthmatic bronchitis and exogenous obesity. She exhibited "warm 1st and 2nd metacarpophalangeal joints and thickening and swelling at the 2nd and 3rd metacarpophalangeal joints bilaterally as well as the proximal interphalangeal joints of all the fingers." Her blood pressure was 152/94 and weight was 229 lbs. on a 5'8" frame. She takes Albuterol for asthmatic bronchitis. Dr. Glaser's conclusion was that "Plaintiff appears incapable of performing even a mild amount of physical activity." (Tr. 130-137).

A Psychiatric Review Technique, a form, was completed in December,2005 by Bonnie Katz, Ph.D. Dr. Katz's diagnosis was Depressive Disorder and a Personality Disorder. She found Plaintiff's degree of limitation regarding the ability to perform activities of daily living as "moderate," and Plaintiff's limitation regarding the ability to maintain social functioning as "mild." Her difficulty maintaining concentration, persistence and pace was rated as "moderate." She was rated as "not significantly limited in all categories of understanding and memory," as moderately limited in her ability to carry out detaned instructions and the ability to maintain attention and concentration for extended periods. She also had a "moderate limitation" of the ability to complete a normal workweek without interruptions from psychologically-based symptoms and the ability to respond appropriately to changes in the work setting. David DeMuth, M.D., agreed with Dr. Katz's assessment. (Tr. 138-154).

A Physical Residual Functional Capacity Assessment was completed in November, 2005 by Lynne Torello, M.D. Dr. Torello's opinion was that Plaintiff could lift 10 lbs. occasionally and less than 10 lbs. frequently, stand for two hours and sit for 6 hours in a workday. She had an unlimited capacity to push/pull with the upper extremities. She should never climb ladders, ropes or scaffolds nor kneel, crouch or crawl. Her ability to perform fine manipulation was

limited. Dr. Torello disagreed with Dr. Glaser's assessment because Dr. Torello found that Plaintiff had a normal gait and intact strength with other joints, but "she does have some hand difficulties." (Tr. 157-164).

Another diagnostic assessment was made in January, 2006 by Shawn Masters at Central Clinic. His diagnosis was Major Depression. Weekly therapy sessions were recommended. (Tr. 165-179).

An examination was conducted in July, 2006 by Kevin Eggerman, M.D., a psychiatrist. Plaintiff's major complaint was arthritis, although Dr. Eggerman described her as showing "symptoms of a chronic personality disorder," which was "aggravated by poly-substance dependence." Dr. Eggerman's opinion was that Plaintiff's ability to remember and carry out short and simple instructions was not limited, but her ability to remember and carry out detailed instructions was mildly limited. Her ability to make judgments on simple work-related decisions was minimally limited. Her ability to interact with the public, supervisors and coworkers and her ability to respond appropriately to work pressures were moderately limited. Her ability to respond appropriately to changes in a routine work setting was mildly limited. Dr. Eggerman's proposed treatment regime included: (1) abstention from the use of illicit substances, (2) a 12-step program with a sponsor, (3) structure daily activities, (4) no isolation and (5) formal psychiatric treatment. (Tr. 180-186).

A bronchoscopy was performed at University Hospital in September, 2006, after Plaintiff complained of breathing problems. The results showed the presence of "submucosal pits" and "evidence of tobaccism." Smoking cessation was strongly encouraged by Jonathan Puchalski, M.D. (Tr. 199-205) An Endoscopy, also in September, 2006, showed evidence of "mild disease, no functional impairment." (Tr. 195-196). X-rays performed in July, 2006 showed a "history of smoking." (Tr. 209-210).

Plaintiff was treated in the Emergency Department of University Hospital in February, 2003 for aching joints, including the feet, knees and hands. George Shaw, M.D. prescribed Ibuprofen and referred her to a rheumatologist. Dr. Shaw made Plaintiff aware that her blood pressure, 184/104, was high. (Tr. 212-213).

X-rays of Plaintiff's left hand or observations made by Susan Sharp, M.D., showed "diffuse soft tissue swelling throughout the hands" in February, 2003. (Tr. 214-216).

Central Clinic records show Plaintiff was engaged in therapy over a period of time from January, 2006 to October, 2007. Topics discussed included past encounters with sexual molestation, her son's incarceration, life problems, anger management, substance abuse, sleep and emotional problems. Plaintiff was taking Seroquel and Ambilify for depression. (Tr. 222-253).

Plaintiff saw David Greenblatt, M.D., a rheumatologist at Deaconess Arthritic Center, in December, October, August, June and January of 2007. Dr. Greenblatt's diagnosis was rheumatoid arthritis. Plaintiff reported 60-120 minutes of morning stiffness and the physical exams showed swelling in her wrists, knees and fingers. Her blood pressure was consistently elevated. Methotrexate, Naprosyn and Humira were prescribed. (Tr. 255 and 265). Plaintiff also saw Dr. Greenblatt in March, June and September of 2006. CBC, liver profile and creatine tests were performed to monitor for adverse drug reactions. (Tr. 259-261). Dr. Greenblatt reported in March, 2006 that Plaintiff's rheumatoid arthritis was "treated with improvement." He reported that "she maintains soft tissue swelling at the right wrist and knees and continues to have an hour of morning stiffness with associated fatigue." She was prescribed Methotrexate, Naprosyn and Humira. Dr. Greenblatt said: "She does have some limitation, but not to such a degree that it would render her totally unemployable in all capacities." (Tr. 262). In June, 2005, Dr. Greenblatt reported that Plaintiff "has significant limitations in her ability to perform repetitive tasks using the hands." (Tr. 263).

Central Clinic records from the period from October, 2007 to April 8, 2008 show a number of clinical contacts. Plaintiff was depressed about financial and housing difficulties. She attended therapeutic sessions and her medications were monitored. (Tr. 268-282).

Hanna Badreddine, M.D., a rheumatologist, is a member of the Deaconess Arthritis Center, as is Dr. Greenblatt. Dr. Badreddine saw Plaintiff in June-July, 2008 for right hand pain as well as knee and foot pain, fatigue and depression. She ordered x-rays of Plaintiff hands, which disclosed "small marginal erosions at the medial aspect of the bases on the 2nd, 3rd and 4th proximal phalanges of the right hand and of the 2nd through 5th phalanges of the left hand." There was also "diffuse soft tissue swelling." The radiologist, Melinda Wilson, M.D. reported to Dr. Badreddine that "the marginal erosions are most consistent with rheumatoid arthritis." (Tr. 290).

Shawn Masters, a supervising professional clinical counselor employed by Central Clinic,

a nonprofit agency providing mental health services to the urban poor, evaluated Plaintiff, based on his experience as a therapist during the period from January, 2006 to October, 2008. Her impairments included major depression, posttraumatic stress disorder, personality disorder, rheumatoid arthritis, COPD and high blood pressure. Counselor Smith reported that Plaintiff's insomnia and depression "has not lessened in two years of therapy and will continue indefinitely." Among the symptoms displayed were the following: appetite disturbance, decreased energy, thoughts of suicide, feelings of guilt or worthlessness, mood disturbance, difficulty concentrating, recurrent recollections of a traumatic experience, pathological dependence, persistent disturbance of mood or affect, change in personality, emotional withdrawal, intense and unstable interpersonal relationships, emotional lability, maladaptive patterns of behavior, illogical thinking, easy distractibility, memory impairment and sleep disturbance.

On a list of 16 mental abilities and aptitudes needed to do unskilled work, Shawn Masters evaluated Plaintiff as either "unable to meet competitive standards" or "no useful ability to function." On a list of 4 mental abilities and aptitudes needed to do semiskilled and skilled work, Counselor Smith rated Plaintiff as "unable to meet competitive standards." Plaintiff's functional limitations were rated as "extreme" regarding her ability to perform the activities of daily living, maintain concentration, persistence or pace, and maintain social functioning. Four or more episodes of decompensation within a 12-month period were indicated. His opinion was that Plaintiff would miss more than 4 days of work per month because of her impairments and that her impairments would be expected to last at least for a 12-month period. (Tr. 296-301).

Finally, Dr. Beddradine completed a residual functional capacity evaluation in December, 2008. She diagnosed Plaintiff with rheumatoid arthritis and said Plaintiff exhibited swelling of the hands, wrist, knees and feet. She estimated that Plaintiff could stand/walk for 1/2 hour and sit for 1 hour without interruption. Marked limitations were indicated relative to Plaintiff's ability to reach and push/pull. She had a moderate limitation of her ability to handle. (Tr. 316-317).

## OPINION

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

8

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 CFR §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 CFR §404.1521(b). Plaintiff is not required to establish total disability at this level of the evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir.1984). The severity requirement may be employed as an administrative convenience to screen out claims that are totally groundless solely from a medical standpoint. *Higgs v. Bowen,* No. 87-6189, slip op. At 4 (6th Cir. Oct.28, 1988). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work

9

experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The Secretary's decision on this issue must be supported by substantial evidence. *Mowery v. Heckler*, 771 F.2d 966 (6th Cir. 1985).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321 (6th Cir. 1978); *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *see Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, the mere presence of a mental impairment does not establish entitlement to disability benefits. In order for a claimant to recover benefits, the alleged mental impairment must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory findings or psychological test findings. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(B); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Alleged mental impairments are evaluated under the same sequential analysis as physical impairments. Once the Commissioner determines that a mental impairment exists, he/she must then evaluate the degree of functional loss it causes according to a special procedure. 20 C.F.R. §§ 404.1520a and 416.920a. A standard document, called the Psychiatric Review Technique Form, must be completed at each level of administrative review. This form, which corresponds to the Listing of Impairments for mental impairments, lists the signs, symptoms, and other medical findings which establishes the existence of a mental impairment.

The special procedure then requires a rating of the degree of functional loss resulting from the impairment. 20 C.F.R §§ 404.1520a(b)(2) and 416.920a(b)(2). Plaintiff's level of functional limitation is rated in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, and pace; and 4) deterioration or decompensation in work or work-like settings. 20 C.F.R. §§ 404.1520a(c)(3)and 416.920a(c)(3); *see Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1993)(per curiam). The first three areas are rated on the following five-point scale: none, mild, moderate, marked, and extreme. The fourth is rated on the following four-point scale: none, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. 20 C.F.R. §§ 404.1520a(c)(4)and 416.920a(c)(4).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder. If it does not, the Commissioner must then complete a Mental Residual Functional Capacity Assessment form. This form also seeks to evaluate functional loss; however, it is intended to provide a more detailed analysis than that provided by the Psychiatric Review Technique form. The Commissioner must determine if this mental residual functional capacity is compatible with the performance of the individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are compatible with this assessment. *See* 20 C.F.R. §§ 404.1520(e)-(f), 404.1520a(c).

The grid may be used to obtain the ultimate conclusion of disability when the findings of fact as to plaintiff's age, education, work experience, and residual functional capacity correspond precisely with the components of the relevant rule. 20 C.F.R. Subpart P, Appendix 2, § 200.00; *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528-29 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983). Each of the Commissioner's findings concerning the individual's age, education, work experience, and residual functional capacity must be supported by substantial evidence. *Id.* When the grid is applicable, the Commissioner may obtain a directed conclusion of nondisability and may take administrative notice that jobs exist in the national economy that plaintiff can perform. *Heckler v. Campbell*, 461 U.S. 458 (1983). If plaintiff suffers from a nonexertional impairment that restricts performance of a full range of work at the appropriate residual functional capacity level, the grid is inapplicable and the Commissioner must rely on other evidence to carry her burden. 20 C.F.R.

11

Subpart P, Appendix 2, § 200.00(e).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson v. Secretary of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam) (emphasis in original); *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). Taking notice of job availability and requirements is disfavored. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 536-37 n.7, 540 n.9 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *Richardson*, 735 F.2d at 964; *Kirk*, 667 F.2d at 536-37 n.7. The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980)(citing *Taylor v. Weinberger,* 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform. *Born v. Secretary of H.H.S.,* 923 F.2d 1168, 1174 (6th Cir. 1990); *Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

It is the Commissioner's function to resolve conflicts in the medical evidence and to

12

determine issues of credibility. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review. *Hurst v. Secretary of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckle*r, 821 F.2d 316, 321 (6th Cir. 1987).

      A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano,* No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze,* 314 F.2d 686, 690 (6th Cir. 1963); *Lachey v. Secretary of H.H.S.,* 508 F. Supp. 726, 730 (S.D. Ohio 1981).

      If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with

or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

Plaintiff asserts in her first Statement of Error that the ALJ erred by failing to explain how she assessed the residual functional capacity of the Plaintiff as able to perform a full range of exertional work. Dr. Glaser, an examining, but non-treating physician, thought that Plaintiff was not able to perform a mild amount of physical activity. Dr. Torello, a paper reviewer, made of less restrictive assessment than Dr. Glaser, but certainly found Plaintiff unable to perform the exertional requirements of medium work. Dr. Badreddine's residual functional capacity assessment is quite close to the assessment provided by Dr. Glaser. There is no dispute that Plaintiff has rheumatoid arthritis. Dr. Shaw recognized the problem and referred Plaintiff to Drs. Greenblatt and Badreddine of the Deaconess Arthritic Center, both of whom are rheumatologists

14

and both of whom diagnosed Plaintiff with rheumatoid arthritis. Dr. Wilson, the radiologist, said that x-rays of Plaintiff's hands were consistent with rheumatoid arthritis and Plaintiff was treated with medications commonly used for the treatment of rheumatoid arthritis. From the above, we must conclude that a residual functional capacity assessment that makes Plaintiff capable of performing work at all exertional levels is erroneous, whether explained or not, but the ALJ's ultimate decision is not necessarily erroneous.

The second Statement of Error is really that the ALJ failed to cite good reasons for not following the opinions of Dr. Greenblatt and Shawn Masters. Dr. Greenblatt said that Plaintiff had rheumatoid arthritis as exhibited by swelling of her wrist and knees. He said that stiffness and fatigue are symptoms of the disease. He further stated that although Plaintiff has some limitations with regard to repetitive tasks using her hands, she is "not totally unemployable in all capacities." The residual functional capacity assessment, ultimately accepted by the ALJ, accommodated Dr. Greenblatt's restriction that Plaintiff should be limited to jobs requiring only occasional manipulation with the hands. Notwithstanding the reasons expressed by the ALJ, the record itself shows that Dr. Greenblatt was not as supportive of Plaintiff's claim as she apparently thinks and that the sole restriction gleaned from his opinion was adopted by the ALJ in her residual functional capacity assessment.

The professionals expressing views on Plaintiff's mental health status were Dr. Eggerman, an examining, but non-treating psychiatrist, Dr. Dreyer, an examining clinical psychologist, Dr. Katz, a clinical psychologist, but a paper reviewer, and Shawn Masters, a treating counselor at Central Clinic. All agree that Plaintiff has a Depressive Disorder and a Personality Disorder and everyone, but Shawn Masters, further agrees that Plaintiff has no mental or emotional functional impairments that are serious or marked. There are individual differences among the three opinions with Dr. Eggerman assessing the least limitations and Dr. Katz the most, but clearly the opinion of Shawn Masters is far more restrictive than the others. Given the conflicting views of the mental health professionals, it was not error for the ALJ to adopt the prevailing consensus. The ALJ accommodated Plaintiff's functional mental limitations by limiting her to jobs with simple instructions and no emphasis on speed or production.

The third Statement of Error is that the ALJ failed to give the most weight to treating

15

sources, Drs. Greenblatt and Badraddine and Shawn Masters. As previously discussed, the opinion of Shawn Masters was completely out of line with the other three mental health providers, two of which held doctorates and the third was a practicing psychiatrist. The ALJ's adoption of the prevailing view was not error. On the physical side, there was unanimous agreement that Plaintiff had rheumatoid arthritis and that typical symptoms are joint pain and stiffness. Dr. Greenblatt did not assess Plaintiff's functional limitations except to say that her ability to perform repetitive tasks with her hands was significantly limited.. Dr. Greenblatt emphasized that Plaintiff was not unemployable. Dr. Badreddine, an associate or partner of Dr. Greenblatt, confirmed the diagnosis of rheumatoid arthritis. Dr. Badreddine's partial residual functional capacity assessment limited Plaintiff to sitting for 1 hour at a time and standing/walking for 1/2 hour at a time. Dr. Badreddine would limit Plaintiff from pushing or pulling and to some extent, from excessive handling. Dr. Torello disagreed that Plaintiff had any limitation regarding her ability to push/pull.

Four physicians evaluated Plaintiff. In addition to Drs. Greenblatt and Badreddine, both of whom are treating sources, Plaintiff was examined by Dr. Glaser and a paper review was done by Dr. Torello. Dr. Badreddine's view is closest to Dr. Glaser, but Dr. Torello, whose view is perhaps the most extreme, still limits Plaintiff to sedentary work, an opinion apparently shared by Dr. Greenblatt. Again, we fail to see how the ALJ, who accepted a consensus view, made any error. To be clear, we regard the ALJ's residual functional capacity assessment that Plaintiff had *no exertional limitations* to be clearly erroneous, but the VE located a number of jobs Plaintiff could perform at the sedentary and unskilled level. This conclusion by the VE, which was accepted by the ALJ, effectively cured the erroneous residual functional capacity assessment made by the ALJ, assuming that the jobs existed in representative numbers. Thus, there was no error.

Plaintiff faults the ALJ for the negative impact of her criminal history, basically for assaultive behavior and drug use, although she admitted to having a theft conviction. A conviction for theft has direct impact on one's credibility as a witness. Drug use may affect one's credibility; it also may be an effort to self-treat an underlying impairment and therefore lend some degree of credibility to Plaintiff's testimony. Assaultive behavior may have an impeaching

16

effect to some extent, but minimal. Plaintiff's drug and alcohol abuse had a negative effect on her credibility as a witness as stated by the ALJ at Page 9 of his opinion. The ALJ, who had the opportunity to see Plaintiff and listen to her testify, has a clear advantage over a paper reviewer like the undersigned in assessing credibility. In calling it as she saw it, the ALJ made no error.

Lastly, Plaintiff asserts that the ALJ made a prejudicial vocational error in reference to the number of sedentary and unskilled jobs, surveillance system monitor and callout monitor. Substantial evidence supports an RFC determination that Plaintiff can perform the exertional requirements of sedentary work. The expressed limitation regarding a limitation to only occasional manipulation of the hands is fully supported by the medical evidence. The VE located two sedentary and unskilled jobs which do no involve either hand manipulations or repetitive foot movements, the latter of which was not an expressed limitation, but probably should have been in the RFC assessment in the first place. There are 25,210 surveillance system monitor jobs in the national economy and 18,840 callout operator jobs. The total of approximately 44,000 jobs is, as the VE represented, a representative number of jobs in the national economy. Therefore, we do not sustain this final Statement of Error.

For the reasons stated above, we do not find any prejudicial error and find that substantial evidence supports the ALJ's ultimate conclusion that Plaintiff is able to work and is not disabled.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be AFFIRMED and this case be dismissed from the docket of this Court.

June 9, 2010

Timothy S. Hogan
United States Magistrate Judge

17

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), within fourteen (14) days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).